IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LISA SHIVELY, et al.,              )  Case No. 5:11 CV 2398

                                   )

       Plaintiffs,                 )

                                   )  JUDGE BENITA Y. PEARSON

-vs-                               )

                                   )

GREEN LOCAL SCHOOL DIST., et al.,  )

                                   )

       Defendants.                 )

                                   )

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR**

**JUDGMENT ON THE PLEADINGS**

---

Kenneth D. Myers [0053655]
6100 Oak Tree Blvd., Suite 200
Cleveland, OH  44131
(216) 241-3900
(440) 498-8239  Fax
kdmy@aol.com

Counsel for Plaintiffs

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 1

LAW AND ARGUMENT . . . . . . . . . . . . . . . . . . . . 3

   I.  PARENTS' ALLEGED LACK OF JURISDICTION . . . . . . . . . 3

  II. PLAINTIFFS' FOURTEENTH AMENDMENT SUBSTANTIVE
     DUE PROCESS CLAIM . . . . . . . . . . . . . . . . . . 4

 III. PLAINTIFFS' FOURTEENTH AMENDMENT
     EQUAL PROTECTION CLAIM . . . . . . . . . . . . . . . 6

  IV. PLAINTIFFS' FIRST AMENDMENT CLAIMS . . . . . . . . . 8

   V. PLAINTIFFS' POLICY AND PRACTICE (MONELL) CLAIM . . . . 11

  VI. PLAINTIFFS' TITLE IX CLAIM . . . . . . . . . . . . . 14

 VII. PLAINTIFFS' CLAIMS AGAINST INDIVIDUALS
     IN OFFICIAL CAPACITY . . . . . . . . . . . . . . . . 16

VIII. PLAINTIFFS' CLAIMS AGAINST INDIVIDUALS
     IN PERSONAL CAPACITIES . . . . . . . . . . . . . . . 16

  IX. QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . 18

   X. PLAINTIFFS' NEGLIGENCE CLAIM AND STATE LAW IMMUNITY . 18

  XI. MALICIOUS PURPOSE . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . .21

-i-

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Aratari v. Leetonia Exempt Village Sch. Dist.</u>,
2007 Ohio 1567 . . . . . . . . . . . . . . . . . . . . 19

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) . . . . . . . . . . 3

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,557 (2007) . . . . . 3

<u>Bishop v. The Children's Center for Developmental
Enrichment</u>, 618 F.3d 533 (6th Cir. 2010), hn 6 . . . . . . 3,18

<u>Boyer v. Jablonski</u>, 70 Ohio App.2d 141,146 (1980) . . . . . . 19

<u>Collins v. City of Harker Heights</u>, 503 U.S. 115,122 (1992) . 11

<u>County of Sacramento v. Lewis</u>, 523 U.S. 833,949 (1998) . . . 5

<u>Davis v. Monroe Cty. Bd. of Ed.</u> (1999),
526 U.S. 629, 650 . . . . . . . . . . . . . . . . . . . . 14

<u>DeShaney v.Winnebago County Dept. of Soc. Servs.</u>,
490 U.S. 189,195 (1989) . . . . . . . . . . . . . . . . . . 3,5

<u>Doe v. Big Walnut Local Sch. Dist. Bd. of Ed.</u>,
2011 U.S. Dist. LEXIS 81953 (S.D.Ohio 2011) . . . . . 5,6,11,12

<u>Doe v. Claiborne County, Tenn.</u>, 103 F.3d 495,505-506
(6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 4,11

<u>Fabrey v. McDonald Police Detp.</u>, 70 Ohio St.3d 3351,356 . . 20

<u>Gant ex rel. Gant v. Wallingfor Bd. of Educ.</u>,
195 F.3d 134,139-40 (2d Cir. 1999) . . . . . . . . . . . . 7

<u>Gomez v. Toledo</u>, 446 U.S. 635,638 (1980) . . . . . . . . . 5

<u>Harper v. Poway United School Dist.</u>,
455 F.3d 1052 (9th Cir. 2006) . . . . . . . . . . . . . 9,10

<u>Howard v. Grinage,</u> 82 F.3d 1343,1350 (6th Cir. 1996) . . . . 4

<u>Jones v. Reynolds</u>, 438 F.3d 685,6909 (6th Cir. 2006) . . . . 5

<u>Koulta v. Merciez</u>, 477 F.3d 442,445 (6th Cir. 2007) . . . . . 5

<u>LRL Properties v. Portage Metro Hous. Auth.</u>,
55 F.3d 1097,1111 (6th Cir. 1995) . . . . . . . . . . . . 7

<u>Mathis v. Wayne County Bd. of Ed.</u>, Sixth Cir. Case No.
11-5979 (August 23, 2012) at 7 . . . . . . . . . . . . . .15

<u>Moncol v. Bd. of Ed.</u> (1978), 55 Ohio St.2d 72,75 . . . . . . 19

<u>Monell v. Dep't. of Soc. Servs. of City of New York</u>,
436 U.S. 658,691 (1978) . . . . . . . . . . . . . . . 4,11,12,13

<u>Pahssen v. Merrill Cmty. Sch. Dist.</u>,
668 F.3d 356,363 (6th Cir. 2012) . . . . . . . . . . . . 14

<u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469,483 (1986) . . . 11

<u>Pounds v.Katy Indep. Sch. Dist.</u>,
517 F.Supp.2d 901 (S.D. Tex. 2007) . . . . . . . . . . . . 9

<u>S.S. v. Eastern Kentucky University</u>,
532 F.3d 445 (6th Cir. 2008) . . . . . . . . . . . . . . 5

<u>Shadoan v. Summit Ctyu. Children Serv. Bd.</u>,
2003 Ohio  5775 at P14 . . . . . . . . . . . . . . . . 19,20

<u>Thomas v. City of Chattenooga</u>,
398 F.3d 426,429 (6th Cir. 2005) . . . . . . . . . . . . 11

<u>Titus v. Dayton Bd. of Ed.</u>, 2000 Ohio App. LEXIS 204,hn4 . . 19

<u>T.K. v. New York City Dep't. of Educ.</u>,
 779 F.Supp.2d 289 (E.D.N.Y. 2011) . . . . . . . . . . . . 9

<u>Vance v. Spencer County Pub. Sch. Dist.</u>,
231 F.3d 253,261 (6th Cir. 2000) . . . . . . . . . . . .14,15

<u>Williams v. Port Huron School Dist.</u>,
455 Fed. Appx. 612 at 18 (6th Cir. 2012) . . . . . . . . . 7


<u>Statutes</u>

20 U.S.C. Section 1681 . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. Section 1983 . . . . . . . . . . . . . . . . . . . 4,7

Ohio Revised Code Section 2744 . . . . . . . . . . . . . . . 20

Ohio Revised Code Section 2744.03(A)(6)(b) . . . . . . . . . 20

-iii-

<u>INTRODUCTION</u>

T.S. was a student in the Green Local School District.  She was literally bullied out of the school.  For approximately five years, according to the Amended Complaint, she was relentlessly and repeatedly bullied by other students; primarily because of her nationality/religion (Jewish) and her gender.  The bullying was verbal, physical and electronic. She and her family repeatedly complained about the bullying to Green school officials.  Numerous Green school officials knew about the bullying.  They also knew that T.S. had become  depressed and required medical attention.

But instead of investigating and recording the allegations of bullying or taking affirmative steps to protect T.S., Green school officials attempted to re-define the bullying so as to excuse their failure to address it; blamed T.S.; passed the buck and feigned ignorance.  They violated their own policies.    The result was that T.S. had to leave the Green school system.

<u>FACTS</u>

Defendants correctly state that in a motion for judgment on the pleadings, all well-pled factual allegations are deemed to be true. But then defendants gloss over and minimize the facts as stated.  Thus, plaintiffs will recite the facts, taken from the Amended Complaint, with the paragraph number following each stated fact.  (As the Court is aware, plaintiff James Shively recently passed away.  Plaintiffs have not yet substituted Mr. Shively's estate as a plaintiff, so where applicable this brief will refer to Mr. and Mrs. Shively together as "parents" for brevity and convenience, since it is probable that Mr. Shively's estate, when substituted, will maintain the same legal status as Mr. Shively had.)

Plaintiffs James and Lisa Shively are the parents of T.S., who was 14 at the time of the filing of the Amended Complaint (9). T.S. was at all relevant times a minor and a student in the Green Local School District (9).  She is one of the few Jews who attend Green (10).  For many years, T.S. has endured harassment and bullying at school by other students, much of it based on her religion (11).

Specific examples of the bullying and harassment include: students regularly telling T.S. she would "rot in hell" because she does not believe in Jesus Christ; students regularly calling her "dirty Jew" and "Hitler"; she was knocked into lockers while walking in the hallways at school; she was tripped, shoved, hit, kicked, had her books knocked out of her hands regularly; she was stabbed in the leg with a pencil, for which she had to be treated at an urgent-care

center; she was verbally abused on a daily basis when several boys would call her a "fucking Jew" as she got on the school bus; she was spat upon; she was assaulted in the choir room, requiring a trip to the hospital and requiring T.S. to wear crutches for several weeks; the boy who assaulted her and others then threatened to break the crutch over her head; several students created a Facebook page entitled, "If you think T.S. is a whore and needs to go back to 8th grade, join!"; T.S. was placed on a "kill list" by other students; students shouted "Jew" at T.S. during a Club Fair in the cafeteria; a girl approached T.S. in the cafeteria and called her a "whore" as well as other names; T.S. was teased and harassed for an entire school day, causing her to come home in tears (13(a-m)).

On October 3, 2011, Mrs. Shively informed school officials that T.S. could no longer attend Green High School because of the bullying and the school's failure to respond to it (14).

The defendants knew or should have known about the constant harassment because Mrs. Shively, T.S.'s mother, visited, e-mailed and called whichever school T.S. was attending at the time on numerous occasions to complain about the bullying, to ask that something be done, and to warn school officials that T.S. was depressed because of the constant harassment; on several occasions, Mrs. Shively contacted law enforcement authorities, including a resource officer who worked inside the school (16).

Several times during the 2008-2009 school year, when Mrs. Shively complained to defendant Mark Booth, principal of Green Intermediate School, Booth told Mrs. Shively that T.S. should fight a boy who was bullying her, and another time Booth told Mrs. Shively that T.S. enjoyed the attention (18).

Despite being told repeatedly about the bullying and harassment, defendants did nothing to stop or diminish the harassment, nor did they punish or discipline the perpetrators, despite the fact that the defendants were told by Mrs. Shively and T.S. who the perpetrators were and despite the fact that the school district has a clear policy prohibiting bullying, harassment and discrimination based on religion (19).

As a result of the constant bullying and the school district's failure to address it, T.S. became so depressed that on October 3, 2011, she had to withdraw from the Green Local School District, which caused T.S. to miss three weeks of school with only minimal tutoring during that time (23); T.S. also suffered severe emotional distress (23).

Mr. and Mrs. Shively, on their own behalf and on behalf of T.S., filed suit in this Court; the defendants have filed a motion for judgment on the pleadings, to which plaintiffs now respond.

2

<u>LAW AND ARGUMENT</u>

<u>I.  PARENTS' ALLEGED LACK OF JURISDICTION</u>

Defendants claim that Mr. and Mrs. Shively lack standing to bring claims on their own behalf.  Defendants' motion at 4.

First, defendants claim that many of the parents' claims fall outside the two-year statute of limitations for Section 1983 claims.  Motion at 7.

However, T.S.'s claims are tolled because she is a minor and the parents' claims are likewise tolled because they are "joint and inseparable."

"In Ohio, unless otherwise provided, if a person was within the age of minority at the time his claim accrued, he may bring the claim within the statutory period after the disability was removed.  Ohio Rev. Code Add. Section 2305.16.  If the minor plaintiff's claims are joint and inseparable with the claims of other parties, they too can benefit from his disability and bring their claims within the statutory period after his disability ends." <u>Bishop v. The Children's Center for Develomental Enrichment</u>, 618 F.3d 533 (6th Cir. 2010), hn 6.

Thus, all of T.S.'s claims are within the statute of limitations because her claims have not even accrued for statute of limitations purposes because she is still a minor; her claims do not begin to run until she turns 18. Her parents' claims are similarly tolled because their claims are joint and inseparable from T.S.'s claims.

Next, defendants claim that the Amended Complaint should be dismissed in its entirety because plaintiffs do not meet the pleading standards for plausibility set forth in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) and <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,557 (2007).  This is so relative to the plaintiffs' substantive due process claim, according to defendants, because plaintiffs do not allege any affirmative acts by defendants that would place defendants into the "state-created danger" exception to <u>DeShaney v. Winnebago County Dep't of Social Services</u>, 489 U.S. 189 (1989).

Defendants cite numerous cases that are supposed to stand for the proposition that only allegations of <u>affirmative acts</u>, as opposed to the <u>failure to act</u> alleged by plaintiffs, will suffice to allow a substantive due process claim to stand.

The requirements of a substantive due process claim are discussed more fully below.

However, the "inaction theory" that is discussed below relative to policy and practice claims applies with equal

3

force when discussing the constitutional torts that underlie a <u>Monell</u> policy and practice claim.  "Deliberate indifference" does connote an affirmative act, i.e., the choice, intentionally made, to take no action.

Next, defendants claim that neither T.S. nor her parents "can  identify a fundamental right necessary to proceed with their substantive due process claim."  Motion at 13.  The parents cannot bring a claim on their own behalf because they were not permanently deprived of T.S.'s companionship, defendants claim, and T.S.'s "bodily integrity" claim should fail because the alleged conduct was not severe enough to implicate constitutionally protected interests.  Motion at 14.  There are several problems with these arguments, aside from the fact that T.S. does not make a claim for "bodily integrity."  The other problem is, as explained more fully below, that while the parents' claims stem from incidents that happened to their daughter, these incidents deprived them independently of their right to participate in their child's education by choosing her school, in violation of their own rights.


## II.  PLAINTIFFS' FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM

Plaintiffs bring their constitutional claims under 42 U.S.C. Section 1983.  Section 1983 authorizes claims for relief against any person who, acting "under color of any [state] statute, ordinance, regulation, custom, or usage," deprives an individual of "any rights, privileges, or immunities secured by the Constitution and laws."  <u>Gomez v. Toledo</u>, 446 U.S. 635,638 (1980).  To prevail on a claim under Section 1983, a plaintiff must prove: 1) that the defendant deprived the plaintiff of a right secured by the United States Constitution or federal statute, and 2) that the defendant acted under color of state law.  <u>Id.</u> at 640.  In evaluating this type of claim against a local government entity the Court must also apply a two-part test:  1) the plaintiff must have sufficiently established a constitutional violation, and 2) the Court must determine whether the local government entity caused the constitutional violation.  <u>Doe v. Claiborne County, Tenn.</u>, 103 F.3d 495,505-506 (6th Cir. 1996).

The Due Process Clause has procedural and substantive components that require separate examination.  As the Sixth Circuit has said, "substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty and property interests without procedural safeguards."  <u>Howard v. Grinage</u>, 82 F.3d 1343,1350 (6th Cir. 1996).

To state a claim under the substantive due process clause, a plaintiff must allege "conduct intended to injure

4

in some way [that is] unjustifiable by any government interest[; such conduct] is the sort of official action most likely to rise to the conscience-shocking level." County of Sacramento v. Lewis, 523 U.S. 833,849 (1998).  A showing of mere negligence is insufficient to make out a substantive due process claim. Id.  However, conduct that falls toward the more culpable end of the tort law spectrum of liability, consisting of "something more than negligence but less than intentional conduct, such as recklessness or gross negligence, [require courts to make] closer calls," in which the determination of what shocks the conscience is context-specific. Id.  As the Supreme Court has indicated, "[what]...shocks in one environment may not be so patently egregious in another." Id. at 850.  Thus, an analysis of the totality of the circumstances must occur "before any abuse of power is condemned as conscience-shocking." Id.

Normally, substantive due process does not impose a constitutional duty on a school to protect students from harm inflicted by private actors, such as their classmates. DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189,195 (1989).

However, there are two exceptions to DeShaney;  1) where a state or local government agency takes a person into custody and restrains their liberty, such that it renders the person unable to care for himself; and 2) the "state-created danger exception" when the state takes an affirmative act to increase the risk of harm to its citizens. DeShaney at 199-200.

The first DeShaney exception does not apply here, but the state-created danger exception does apply.

In order to succeed under the state-created danger exception, plaintiffs must show: "1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff." Koulta v. Merciez, 477 F.3d 442,445 (6th Cir. 2007), citing Jones v. Reynolds, 438 F.3d 685,690 (6th Cir. 2006).

In this case. plaintiffs have met the requirements for a state-created danger.

Contrast Green's actions and inactions in this case with the defendants in S.S. v. Eastern Kentucky University, 532 F.3d 445 (6th Cir. 2008).  In that case, as commented upon by the Court in Doe v. Big Walnut Local Sch. Dist. Bd. of Ed., 2011 U.S. Dist. LEXIS 81953 (S.D. Ohio 2011):

...the Sixth Circuit found that school officials were not deliberately indifferent after plaintiff alleged that school

officials denied that a bullying problem existed. (citation omitted) The school officials responded to all incidents they were made aware of; monitored S.S.; separated S.S. from students; disciplined S.S. and other students involved in altercations; called the police; had the police talk to the students; and called the parents of S.S. and other students to address the situation. (citation omitted) Based upon the aforementioned facts, the Sixth Circuit found that the school officials were not deliberately indifferent. (citation omitted) In the case at bar, the actions of the Defendants...are in line with those defendants in S.S. Defendants...along with other school officials, took proactive and affirmative steps to address the inappropriate conduct directed at John Doe. <u>This was not a situation where [defendants] turned a blind eye to John Doe's situation.</u> Accordingly, Plaintiffs cannot satisfy the state-created danger exception, nor can they show that the actions of [defendants] were so egregious or arbitrary as to have violated John Doe's substantive due process rights.

<u>Doe v. Big Walnut Local Sch. Dist. Bd. of Ed.</u>, 2011 U.S. Dist. LEXIS 81953 at 28-29 (S.D. Ohio, 2011), emphasis added.

In this case, the defendants and other school district employees did turn a blind eye to T.S. and her parents. In that sense, they made conscious choices and took the affirmative steps to disregard the complaints and to permit the gender- and religion-based bullying.


## III.  PLAINTIFFS' FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM

Defendants claim that the Court need not accept plaintiffs' allegations as true, that "[n]o claim of deliberate indifference...can be averred legitimately" and that the Equal Protection claim (misidentified by defendants as Count III) should be dismissed. Motion at 16.

To get to this conclusion, defendants make an interesting, yet wholly untenable, argument: Plaintiffs "do not claim that any other similarly situated non-Jewish student received more protection from purported bullying or harassment." Motion at 15-16. On the contrary, defendants allegedly ignored bullying against <u>all</u> students, so plaintiffs cannot claim T.S. was singled out because she was Jewish, so defendants' argument goes. Motion at 16. Further, defendants <u>did</u> take action by expelling bullies and offering T.S. the opportunity to attend school elsewhere. Motion at 16.

First, the argument is factually inaccurate; plaintiffs do not know if the students responsible for the "kill list" were expelled. Plaintiffs state in the Amended Complaint that plaintiffs were promised by school officials that the students responsible for the "kill list" would never set foot in the high school again and one of the perpetrators was seen by T.S. in the cafeteria three weeks later, which would allow for the inference that the students were <u>not</u> expelled or disciplined in any meaningful way. Because further facts must be developed in the course of discovery, it is too early to say, based on the Amended Complaint, that defendants were not deliberately indifferent regarding this

particular incident.

The argument is also factually inaccurate insofar as it implies that defendants responded appropriately to the bullying by offering T.S. the opportunity to attend school elsewhere.  Defendants did not offer T.S. an alternative school; T.S. had to withdraw from Green because of the daily, day-long harassment which was driving her to depression.  She spent three weeks out of school, with minimal tutoring, before defendants found another school for T.S. to attend.  This is hardly the "appropriate response to allegations of bullying", Motion at 16, that the law requires.

What defendants' revisionist history also ignores is the fact that the bullying, both physical, verbal and electronic, went on for years.  It also ignores the fact that the "kill list," which is the only incident about which plaintiffs allege there was even possibly any discipline, occurred in January, 2011; the bullying continued throughout the rest of the 2010-2011 school and into the beginning of the 2011-2012 school year such that in October, 2011, T.S. had to withdraw because of the continued failure of the defendants to take any meaningful action.

Aside from these factual inaccuracies, the defendants' argument misstates the law and has dangerous legal and policy implications.

To state a claim under the Equal Protection Clause, a Section 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.  LRL Properties v. Portage Metro Hous. Auth., 55 F.3d 1097,1111 (6th Cir. 1995).  Plaintiffs must demonstrate defendants' discriminatory intent with respect to their response to the student-on-student harassment.  Gant ex rel. Gant v. Wallingfor Bd. of Educ., 195 F.3d 134,139-40 (2d Cir. 1999) cited in Williams v. Port Huron School Dist., 455 Fed.Appx. 612 at 18 (6th Cir., 2012).  Defendants must have been deliberately indifferent to the allegations of student-on-student harassment.  Id.  Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances.  Id.

Plaintiffs are not required to prove, in the context of an Equal Protection claim that non-Jewish student were bullied or received more protection from bullying than T.S. This would require T.S. to prove the exact opposite of what she is alleging; she is alleging she was singled out because of her religion, and under defendants' theory, she would have to prove that other non-Jewish students were harassed, which would mean that she was not singled out because of her religion.  Plaintiffs are not claiming that all Green students, or even other Green students, were harassed.  Plaintiffs are claiming that T.S. was harassed because of her religion.  Comparisons with similarly-situated members

7

of non-protected classes are not elements of "deliberate indifference" and plaintiffs do not have to prove such.  The legal and policy implications of defendants' argument are staggering: assuming plaintiff is literally driven from the school because of her religion (which the Court must assume for purposes of defendants' motion), why should she have to show that <u>other</u> students who were harassed were treated better before she can file a lawsuit?  In the context of public education, a student need not compare herself with other victims of harassment before she can sustain a cause of action.  It is the school district's response to <u>her</u> complaints, and the alleged deliberate indifference to <u>her</u> complaints that hold sway, not the difference between the level of deliberate indifference displayed toward her complaints compared with the level of deliberate indifference displayed toward others who are harassed (which may be impossible to prove if no other students are being harassed).

Plaintiffs have properly plead an Equal Protection claim, precluding dismissal.


<u>IV.  PLAINTIFFS' FIRST AMENDMENT CLAIMS</u>

Defendants claim that plaintiffs' claims on these counts consist of "conjecture, legal conclusions, and vague assertions unrelated to their factual allegations", Motion at 17, which "fail to suggest that any such rights are at issue" and therefore are not plausible.  Motion at 16.

Defendants claim that plaintiffs "baldly declare that Defendants' failure to protect T.S. from her classmates' taunts '"constitutes a violation of plaintiff's constitutional rights pursuant to the First Amendment to the U.S. Constitution.' Amended Complaint, para. 33.  No suggestions as to what those First Amendment rights might be, or how Defendants purportedly violated them, are presented either in this count or elsewhere in the Amendment Complaint."  Motion at 17.

Defendants apparently did not read the sentence immediately preceding the one quoted in their motion, the one that says: "The actions of all defendants, in failing to enforce plaintiff's right to be secure and to be left alone while in school and to be free from verbal and physical assaults based on a core identifying characteristic such as religion...."  Amended Complaint, para. 33.

Similarly, defendants claim that plaintiffs' First Amendment claims in Count IV fall short.  "Nowhere in their Amended Complaint, however, do Plaintiffs aver facts intimating that T.S. or her parents attempted to practice their religion, or otherwise exercise their First Amendment rights, and were prevented or chilled from doing so by

Defendants." Motion at 17.

The Courts have dealt with both free expression and free exercise cases involving religion in schools.

Public school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion or sexual orientation, have a right to be free from such attacks while on school campuses.  Students have the right to be secure and to be let alone.  Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society.

The "right to be let alone" has been recognized by the United States Supreme Court as "the most comprehensive of rights and the right most valued by civilized men."  Indeed, the recognizable privacy interest in avoiding unwanted communication is perhaps most important when persons are powerless to avoid it. Because minors are subject to mandatory attendance requirements, the United States Supreme Court has emphasized the obvious concern on the part of parents, and school authorities acting in loco parentis, to protect children--especially in a captive audience.  Although name-calling is ordinarily protected outside the school context, students cannot hide behind the First Amendment to protect their "right" to abuse and intimidate other students at school.

The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion.  U.S. Const. amend I.  The Clause prohibits the Government from compelling affirmation of religious belief, punishing the expression of religious doctrines it believes to be false, imposing special disabilities on the basis of religious views or religious status, or lending its power to one or the other side in controversies over religious authority or dogma.

At a minimum, the Constitution of the United States guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tend to do so.

Harper v. Poway United School Dist., 445 F.3d 1166 (9th Cir. 2006), hn 15,16,36,48, vacated as moot, 127 S.Ct. 1484 (2007).

The Harper case, although moot and therefore without precedential value, is still widely cited for its persuasive value, and acquires precedential value via the cases in which it is cited.  See, for example, T.K. v. New York City Dep't. of Educ., 779 F.Supp.2d 289 (E.D.N.Y. 2011); Pounds v. Katy Indep. Sch. Dist., 517 F.Supp.2d 901 (S.D. Tex. 2007).

As Judge Reinhardt said in his concurrence in the order denying a petition for rehearing en banc in Harper, 455 F.3d 1052 (9th Cir. 2006):

....Advising a young high school or grade school student while he is in class that he and other gays and lesbians are shameful, and that God disapproves of him, is not simply "unpleasant and offensive."  It strikes at the very core of the young student's dignity and self-worth.  Similarly, the example Judge Kozinski offers, a T-shirt bearing the message, "Hitler Had the Right Idea" on one side and "Let's Finish the Job" on the other, serves to intimidate and injure young Jewish students in the same way, as would T-shirts worn by groups of white students bearing the message "Hide Your Sisters - The Blacks Are Coming."

Under the dissent's view, large numbers of majority students could wear such shirts to class on a daily basis,

at least until the time minority members chose to fight back physically and disrupt the school's normal educational process. <u>Tinker v. Des Moines Indep. Sch. Dist.</u>, 393 U.S. 503,513 (1969).

Perhaps some of us are unaware of, or have forgotten, what it is like to be young, belong to a small minority group, and be subjected to verbal assaults and opprobrium while trying to get an education in a public school, or perhaps some simply find it difficult to comprehend the extent of the injury attacks such as Harper's cause gay students.  Whatever the reason for the dissenters' blindness, it is surely not beyond the authority of local school boards to attempt to protect young minority students against verbal persecution, and the exercise of that authority by school boards is surely consistent with <u>Tinker</u>'s protection of the right of individual students "to be secure and to be let alone." <u>Tinker</u>, 393 U.S. at 508.

<u>Harper v. Poway Unified Sch. Dist.</u>, 455 F.3d 1052 (2006).

Here, too, T.S. has the right to be left alone regarding her religion.  And she has the right not to be punished or put at some disadvantage for being Jewish.

Assuming T.S. and her family have the constitutional right to be Jewish and to be known as Jewish, the facts as alleged are sufficient to state First Amendment claims; it is obvious from the Amended Complaint (or at least plaintiffs are entitled to the inference) that the Green school community knew T.S. and her family were Jewish; T.S. was called names indicating her tormentors knew she was Jewish, and T.S.'s parents lodged complaints to school officials alleging T.S. was being harassed because of being Jewish.  T.S. does not have to literally get on her knees in the school cafeteria and pray on Rosh Hashanah in order to seek the protection of the First Amendment on religious grounds.  All that is necessary is that she state a plausible allegation that she was punished for exercising her right to identify herself as Jewish, which right the defendants failed to enforce (Count III) and that the defendants, by allowing religion-based bullying and harassment, violated T.S.'s right to the free exercise of her religion under the First Amendment (Count IV).

Defendants claim that plaintiffs' First Amendment claims must fail because plaintiffs present "no facts suggesting that Defendants compromised their ability to practice religion."  Motion at 19.  However, the message that comes from defendants' conduct in failing to take any steps to curtail the religious harassment (which has the effect of tacitly approving of such conduct, especially where Jews are a distinct minority) is, "You can be Jewish.  Just not here."  That is the essence of a violation of one's Free Exercise and religious freedom rights.  It may not chill T.S.'s practice of Judaism, or her identification of herself as Jewish, but it certainly chills it in and around the Green Public Schools.  She can be as Jewish as she wants, just not if she wants to be a student at Green.  Turned around, she could have continued to go to Green, just as the vast majority of Green students do, without any harassment

whatsoever, as long as she is not Jewish.  As long as she is Jewish, she has to understand that she is going to be harassed.  Being forced to strike up that kind of bargain, against one's will, surely qualifies as a violation of the First Amendment.

## V.  PLAINTIFFS' POLICY AND PRACTICE (MONELL) CLAIM

Defendants claim that plaintiffs cannot meet any of the elements of a "policy and practice" claim against the Board.  Plaintiffs cannot demonstrate a constitutional violation, that the entity is responsible for violation of that right or that the violation is caused by a policy or custom, say defendants.  Motion at 20.

A liability claim against a municipality cannot be based solely on the actions of its employees.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658,691 (1978).  Rather, a plaintiff must show that the local government entity itself, in its municipal capacity, is the wrongdoer.  Collins v. City of Harker Heights, 503 U.S. 115,122 (1992).  Plaintiffs must demonstrate not only: 1) the violation of a constitutional right, but also 2) that the enforcement of a municipality's policy, custom, or practice, or a decision of a final policy-maker caused the constitutional violation."  Monell, 436 U.S. at 694.

A "policy" for purposes of a Section 1983 claim is "a deliberate choice to follow a cause of action...made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur v. City of Cincinnati, 475 U.S. 469,483 (1986).  A "custom" within the meaning of Section 1983 is a practice of state officials that is "so permanent and well settled" as to virtually constitute law.  Monell, 436 U.S. at 691.

The Sixth Circuit has recognized that "[t]here are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.  The plaintiff can look to: 1) the municipality's legislative enactments or official agency policies; 2) actions taken by officials with final decision-making authority; 3) a policy of inadequate training or supervision; or 4) a custom of tolerance or acquiescence of federal rights violations."  Thomas v. City of Chattanooga, 398 F.3d 426,429 (6th Cir.), cert. denied, 546 U.S. 814 (2005).

The school board will not be held liable unless plaintiffs can establish "that an officially executed policy, or the toleration of a custom with the school district leads to, causes or results in the deprivation of a constitutionally protected right." Monell v. Dept. of Soc. Services, 436 U.S. 658,691 (1978).

11

Plaintiffs assert that, as noted in <u>Doe v. Claiborne County</u>, no school district would have an affirmative policy condoning personal injury, therefore the Court set forth standards that must be met to state a claim based on an "inaction theory" which is set forth as follows:
1) the existence of a clear and persistent pattern of abuse in the school;
2) notice or constructive notice on the part of the school board;
3) the school board's tacit approval of the unconstitutional conduct, such that the deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
4) that the school board's custom was the "moving force" or direct causal link in the constitutional deprivation. <u>Doe v. Claiborne County</u>, 103 F.3d 495,508 (6th Cir. 1996)....Again, there is no evidence that defendants turned a blind eye to any incidents plaintiff John Doe brought to their attention.  Accordingly, there is no evidence of an existence of a clear pattern of inaction or abuse by any school employees.

<u>Doe v. Big Walnut Local Sch. Dist. Bd. of Ed.</u>, 2011 U.S. Dist. LEXIS 81953 (S.D. Ohio, 2011) at 9-10.

In this case, plaintiffs are alleging that the school district turned a blind eye toward the incidents brought to their attention by plaintiffs.

Plaintiffs meet the four <u>Claiborne</u> factors; they have alleged  the existence of a clear and persistent pattern of violation of constitutional rights; notice or constructive notice on the part of the school board; the school board's tacit approval of the unconstitutional conduct such that the deliberate indifference of its failure to act can be said to amount to an official policy of inaction; and that the school board's custom was the moving force or direct causal link in the constitutional deprivation.  It does not save the defendant that the Board itself, or its individual members did not personally know about T.S.'s complaints.  All that is necessary is to show that the Board had constructive notice of the conduct complained of, gave tacit approval and that the conduct amounted to a policy or custom.

This is a textbook example of an "inaction theory" which creates liability.  Plaintiffs complained to principals and superintendents, over the course of years; the inaction amounted to tacit approval and it became custom or policy.

Plaintiffs have described above why they state valid claims for violations of the Fourteenth Amendment (substantive due process and equal protection) and the First Amendment.  Obviously, if any of these claims fail on their merits at this stage, then no corresponding <u>Monell</u> claim can survive.  However, the converse is also true; if the Court finds plaintiffs have stated causes of action on the constitutional claims, then the first prong of a <u>Monell</u> claim also survives.

As to the second prong of a <u>Monell</u> claim, defendants are correct in citing the elements of a policy of inaction claim.  Motion at 20-21.  However, defendants are incorrect in stating that the actual Board of Education must have actual notice.  As noted above, the Board had constructive knowledge of the incidents via the superintendents.  Thus, plaintiffs have met the criteria for a <u>Monell</u> claim.

12

Defendants claim that the existence of an anti-bullying policy "points against tacit board approval." Motion at 21, citing Doe v. Big Walnut Local, 2011 U.S. Dist. LEXIS 81953 at **33-34. This is not what Doe says and not what the law says. Doe says that because no school would have a policy which condones personal injury, it is necessary to frame a set of standards for determining when constitutional violations occur despite the existence of a policy which prohibits actions that cause personal injuries. The "inaction theory" reconciles the existence of a policy prohibiting such things as bullying with the existence of tacit approval of a policy permitting bullying. Thus, the existence of an anti-bullying policy does not get the defendant board off the hook; the board must actually enforce its policies. By tacitly approving bullying and not enforcing its anti-bullying policies, the board, pursuant to the "inaction theory," actually created a policy tacitly approving bullying, thus violating plaintiffs' rights.

Defendants also claim that plaintiffs' Monell claim "rests entirely on a claim that the entity failed to train its employees." Motion at 21. This is not true. Plaintiffs' Amended Complaint says that defendants' failure to train its employees in proper methods of recognizing, responding to and preventing bullying and harassment "and in permitting bullying and harassment, constitute a violation of defendant Green Local School District Board of Education's obligations to maintain lawful policies and procedures...." Amended Complaint, para. 42.

Plaintiffs are seeking to hold the entity known as the Board responsible for violating plaintiffs' rights under the First and Fourteenth Amendments by allowing and tacitly approving religion-based bullying through actions and inactions that amount to customs, practices and policies. Plaintiffs need not allege that the Board had a "policy in favor of bullying." Motion at 21. Nor are plaintiffs required to allege that the Board itself, or its individual members, were aware of the bullying allegations. Nor do plaintiffs have to allege specific actions the "Board itself could have taken to prevent the teasing or bullying that T.S. purportedly experienced." Motion at 22. (Although if such a statement were required, the obvious answer to the question of what steps the Board could have taken to prevent the teasing or bullying would be to fire any employee who is found to have tolerated one student calling another a "f---ing Jew" or a "dirty Jew.")

The repeated failure to enforce its own policies could rise to the level of a Monell violation, precluding dismissal of the board.

## VI. PLAINTIFFS' TITLE IX CLAIM

13

Defendants claim that plaintiffs cannot maintain a cause of action for student-on-student sexual harassment under Title IX, because gender-based name-calling, and even some instances of physical abuse, are not enough to meet the standard that sexual harassment must be "so severe, pervasive and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school...." Motion at 23, citing Pahssen v. Merrill Cmty. Sch. Dist., 668 F.3d 356,363 (6th Cir. 2012).

Title IX provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance...." 20 U.S.C. Section 1681.

Title IX can support a cause of action for a student's claim of student-on-student sexual harassment against a recipient of federal funds. Davis v. Monroe County Bd. of Ed., 526 U.S. 629,633 (1999).

To establish a prima facie case of student-on-student sexual harassment, the plaintiff must demonstrate each of the following elements:

1) the sexual harassment was so severe, pervasive and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school;

2) the funding recipient had actual knowledge of the sexual harassment; and

3) the funding recipient was deliberately indifferent to the harassment.

Vance v. Spencer County Public Sch. Dist., 231 F.3d 253,258-259 (6th Cir. 2000)

A recipient of federal funds that remains "deliberately indifferent to known acts of harassment" is liable for damages under Title IX. Vance, supra at 260. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable to it." Id. (quoting Davis, 526 U.S. at 645. "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" Vance, 231 F.3d at 260 (quoting Davis, 526 U.S. at 648). A recipient need not "[purge its] schools of actionable peer harassment" or "engage in particular disciplinary action" to avoid Title IX liability. Vance, 231 F.3d at 260. "Furthermore, courts should not second guess the disciplinary decisions that school administrators make." Id. at 260. However:

where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has

14

actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

Id. at 261.

In this case, the known circumstances were the constant, ongoing bullying and harassment of T.S. because of her religion and gender and the parents' constant complaints and pleas for help.  In light of these circumstances, the school district failed to act reasonably when its only claimed remediation is the supposed expulsion of two students who created a "kill list" and then offering T.S. another placement when she had endured bullying for years and finally could take no more.

The Sixth Circuit recently affirmed jury verdicts against a school district and in favor of two boys who had been sexually assaulted in the school locker room.  In affirming a Title IX violation for peer-on-peer sexual harassment, the Court said:

> The jury was aware that [the school district] did not conduct any substantive investigation of either incident, nor did it promptly punish the behavior.  The testimony also indicated that the school officials concentrated their investigation on the marker incident, not the continuing behavior that affected James.  Furthermore, the jury was cognizant of the fact that Sisk only received a light reprimand for his failure to report the marker incident, and the perpetrators of the blind-folded sit-up and light out incidents received only a verbal reprimand.  From this evidence, the jury could have reasonably concluded that [the school district's] remedial steps were insufficient to provide James a safe environment, as further evidenced by his mother's decision to remove him from WMS.  Because the jury may have reasonably concluded that [the school district's] response was too little too late and was too delayed to help James, [the school district's] renewed motion for judgment as a matter of law cannot prevail.

Mathis v. Wayne County Bd. of Ed., Sixth Cir. Case No. 11-5979 (August 23, 2012) at 7.

Here, too, the school district's response, to the extent there was one, was "too little too late" and "too delayed" to help T.S.  Part of the definition of deliberate indifference is not properly investigating and punishing the wrongdoers. In this case, as in Mathis, the school district's attempts to provide a safe environment for T.S., if there were any, were insufficient.  It is also important to note the Mathis case went to trial, meaning that the issues of deliberate indifference being debated at the appellate level obviously did not result in a dismissal  ruling for the school district.

The Amended Complaint alleges that T.S. suffered harassment on an almost daily basis for years, "much of it based on her religion."  Amended Complaint at para. 11.  However, several instances described in the Amended Complaint sound more in gender-based harassment than religious-based harassment (such as the Facebook page inviting readers to join if they think T.S. "is a whore," Amended Complaint at para. 13(i); and one student calling T.S.

a "whore" in front of other students, Amended Complaint at para. 13(l)).  But because T.S. endured so much harassment, verbal, physical and electronic, and because some of the instances described in the Amended Complaint do not parse out the specific reason--religion or gender--for the harassment because the perpetrators did not always advertise their reasons for harassing T.S., plaintiffs are entitled to the presumption--pending discovery--that at least some of the instances of the seemingly-perpetual harassment were based on gender.  At this stage of proceedings, plaintiffs should not have to bear the burden of identifying the specific motivation behind each and every instance of harassment or bullying in order to maintain a Title IX claim, especially when it is clear that at least some of the instances related to T.S.'s gender.

## VII.  PLAINTIFFS' CLAIMS AGAINST INDIVIDUALS IN OFFICIAL CAPACITY

Defendants ask the Court to dismiss all claims against individual defendants in their official capacities as duplicative of the claims made against the entity. Defendants are correct as far as they go: while plaintiffs make claims against both the entity and the individuals in their official capacities, defendants have asked the Court to dismiss all claims against all defendants in all capacities; thus, by naming individuals in their official capacities and the entity, plaintiffs have given the Court options when determining how to allot liability.  It is plaintiffs' view that both the individuals and the entity are responsible, but it is disingenuous for the defendants to ask for the dismissal of the claims against the individuals in their official capacities as being redundant of the claims made against the entity, and then to ask for the claims made against the entity to be dismissed.  If the defendants are correct and the claims against the entity are dismissed, then the claims against the individuals in their official capacities would not be redundant.  Plaintiffs ask the Court not to dismiss the claims against the individuals in their official capacities unless the Court is overruling the motion to dismiss the claims against the entity.

## VIII.  PLAINTIFFS' CLAIMS AGAINST INDIVIDUAL IN PERSONAL CAPACITIES

Defendants claim that all claims against all individual defendants should be dismissed because of plaintiffs' alleged failure to plead sufficient allegations concerning the involvement of named defendants. This is patently absurd.

Each named defendant is identified in the "Parties" section based on the position they held in the Green school system; two superintendents, the Green High School Principal; and junior high principals and an assistant

16

principal.

The "Facts" section identifies in detail not only the particular acts of bullying and harassment (as well as stating that T.S. underwent additional instances of bullying that were not specifically enumerated), but describes what the parents did to inform school officials of the problems and ask for help.

For example, in April, 2008, Mrs. Shively informed then-superintendent Wade Lucas that she was keeping T.S. out of school as a result of the bullying.  Amended Complaint at 13(j).  On October 3, 2011, Mrs. Shively informed "school officials" that T.S. could no longer attend Green High School because of the bullying and the school's failure to respond to it. Amended Complaint at para. 14.  The defendants knew about the harassment because Mrs. Shively "visited, e-mailed and called whichever school T.S. was attending at the time on numerous occasions to complain about the bullying, to ask that something be done, and to warn school officials that T.S. was depressed because of the constant harassment." Amended Complaint at para. 16.  On several occasions during the 2008-2009 school year, Mrs. Shively complained to defendant Mark Booth.  Amended Complaint at 18. Despite being told repeatedly about the bullying and harassment, defendants did nothing to stop or diminish the harassment.  Amended Complaint at para. 19.  Due to the actions and omissions of the defendants, jointly and severally, T.S. became so depressed that she had to withdraw from school.  Amended Complaint at para. 23.  Despite T.S. having to withdraw, it took defendant Nutter three weeks to place T.S. at another school.  Amended Complaint at para. 24.

Defendants claim that all of plaintiffs' allegations should be dismissed because they "fail to present timely allegations against any particular person."  Motion at 26.  This is exactly the opposite of true.  Plaintiffs have made allegations against all particular persons.  Without detailing which particular complaints and how many, were directed at each defendant, the Amended Complaint makes clear that over the course of years, Mrs. Shively repeatedly went to the assistant principal or principal of whatever school T.S. was attending, and whichever superintendent was in office at the time, and complained.  The standards for pleading do not require the type of specificity defendants seem to demand.

In this case, each defendant is properly on notice that he or she is being accused of constitutional and statutory and tort violations for his or her particular role in ignoring the bullying and failing to act, even when notified by Mrs. Shively of acts of bullying and harassment.

In the event this Court finds that the Amended Complaint is not sufficient to place each defendant on notice

17

as to the allegations against him or her, plaintiff asks that the Court, rather than dismissing the claims altogether, allow the plaintiffs to amend the complaint further, so that plaintiffs can catalogue the hundreds of visits, phone calls and e-mails they sent over the years to defendants.  Although plaintiffs do not believe this is necessary at the pleading stage, if defendants believe they have not been given appropriate notice as to the allegations against them (despite having been the recipients of these hundreds of communications from Mrs. Shively and T.S.), then rather than have the claims dismissed, plaintiffs ask the Court to allow a further amendment to make sure the defendants are absolutely clear just how culpable each one of them is alleged to be.

As to the statute of limitations argument which defendants repeat, as stated above, this allegation borders on frivolous.  Defendants surely must know that because T.S. is a minor, the statute of limitations on her claims is tolled.  Bishop v. The Children's Center for Develomental Enrichment, 618 F.3d 533 (6th Cir. 2010).  And it is also well-established that the parents' claims are also tolled because they are intertwined with T.S.'s claims.  Id.


IX.  QUALIFIED IMMUNITY

Defendants basically repeat their earlier-cited position that the individual defendants have not committed any constitutional violations.  If there are no constitutional violations, then the defendants are entitled to qualified immunity, defendants claim.  This is true.  If no constitutional violations are found, then obviously the plaintiffs' claims fail before a qualified immunity analysis is even done.

However, the converse is also true: if constitutional violations are found, then defendants are not entitled to qualified immunity because, as defendants concede, the constitutional provisions were clearly established at the time.

Defendants are not entitled to qualified immunity because, assuming the allegations in the Amended Complaint to be true, defendants committed constitutional violations which were clearly established.


X.  PLAINTIFFS' NEGLIGENCE CLAIM AND STATE LAW IMMUNITY

Defendants claim that school employees are not liable for negligence or gross negligence claims because they do not rise to the level of wanton, reckless, malicious or bad faith, which is required to nullify immunity under state law.  This is not a correct reading of the law.

In order for a plaintiff to establish negligence, he must prove the following:  1) defendant owed him a duty;

18

2) that duty was breached; and 3) that breach of duty proximately caused plaintiff's injury.  Moncol v. Bd. of Ed. (1978), 55 Ohio St.2d 72,75, cited in Titus v. Dayton Bd. of Ed., 2000 Ohio App. LEXIS 204, hn 4 (Ohio App. 2000).  A teacher in a public school has been held to an ordinary duty of reasonable care in exercising her duties.  Baird v. Hosmer (1976), 46 Ohio St.2d 273, syllabus, cited in Titus at hn5.  This is the same duty owed by the general public to other people.  This duty does not require constant personal supervision of each student in a teacher's class.  Consequently, lack of supervision alone is not a breach of a teacher's duty to her students.  Titus, supra at 5.  For an act to be the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of such act.  To find that an injury was the natural and probable consequence of an act, it must appear that the injury complained of could have been foreseen or reasonably anticipated from the alleged negligent act.  Id.

In this case the individual defendants had a duty to T.S., the same as the general public, of reasonable care.  They breached that duty by failing to take reasonable steps to curtail the bullying.   The foreseeable result was injury, both physical and emotional, to T.S., and her eventually having to withdraw from the Green schools.

Teachers are not automatically immune from negligence claims.

"That is not to say that teachers in all cases are immune from suit when students are injured because of a failure by the teacher to protect the student.  Boyer v. Jablonski, 70 Ohio App.2d 141,146 (1980), cited in Aratari v. Leetonia Exempt Village Sch. Dist., 2007 Ohio 1567 at P34.

School employees can be found negligent, but only if they are also found not to enjoy immunity, i.e., if they are also found to be wanton, reckless, etc.

Generally, the issue of malice, bad faith, and wanton or reckless behavior is a question for the jury.  Shadoan v. Summit Cty. Children Serv. Bd., 2003 Ohio 5775 at P14, cited in Aratari, supra at P67.  However, the standard for demonstrating such conduct is high.  Shadoan, supra at P14.

The individual defendants are not entitled to state law immunity at this point because, giving plaintiffs credit for all factual allegations, it cannot be said at this point that plaintiffs cannot prevail.

Defendants can be liable for negligence or gross negligence as long as plaintiffs are prepared to demonstrate that the allegedly negligent acts are also wanton, reckless, malicious or in bad faith.


XI.  MALICIOUS PURPOSE

19

Individuals employed by government entities are entitled to immunity pursuant to Ohio Revised Code Section 2744.  However, that immunity can be stripped of a public employee if his or her acts or omissions "were with malicious purpose, in bad faith, or in a wanton or reckless manner."  O.R.C. 2744.03(A)(6)(b).  Generally, the issue of malice, bad faith and wanton or reckless behavior is a question for the jury.  <u>Shadoan v. Summit Cty. Children Serv. Bd.</u>, 2003 Ohio 5775 at P14, citing <u>Fabrey v. McDonald Police Dept.</u>, 70 Ohio St.3d 351,356.  One acts wantonly when there is a complete failure to exercise any care whatsoever.  <u>Fabrey</u>,<u>supra</u> at 356.  One acts recklessly if "he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. <u>Shadoan</u>, <u>supra</u> at P13.

In this case, the individual defendants acted wantonly and/or recklessly.  They failed to exercise any care whatsoever in dealing with T.S., over and over again, over a period of time.  They were not only wanton in failing to properly address the bullying, but by doing so, they increased the likelihood that she would be harmed and/or would have to withdraw from school.

<u>CONCLUSION</u>

For the reasons stated above, plaintiffs ask this Court to overrule defendants' motion for judgment on the pleadings on all counts.


Respectfully submitted,


/s/Kenneth D. Myers
KENNETH D. MYERS [0053655]
6100 Oak Tree Blvd., Suite 200
Cleveland, OH  44131
(216) 241-3900

Attorney for Plaintiffs


<u>CERTIFICATE OF SERVICE</u>

20

The foregoing has been sent via the Court's electronic filing system, to all counsel of record, this 27th day of August, 2012.

/s/Kenneth D. Myers
KENNETH D. MYERS

Attorney for Plaintiffs